1  PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

2  Name ___Huynh_____ ___Nam_____ ___V._____

3       (Last)            (First)           (Initial)

   Prisoner Number ___E30183_____

4  Institutional Address __P.O. Box__ 705, Soledad, CA 93960-0705

5

6

7                    UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF CALIFORNIA

8  __Nam Van Huynh_____
   (Enter the full name of plaintiff in this action.)

9                        vs.                           Case No. _____
                                                      (To be provided by the clerk of court)
10 __B. Curry, Warden (A)_____
                                                      PETITION FOR A WRIT
11 __A. Schwarzenegger, Governor.__                   OF HABEAS CORPUS

12 _____

13 _____                     E-filing

14 (Enter the full name of respondent(s) or jailor in this action)

15 _____

16              Read Comments Carefully Before Filling In

17 When and Where to File

18        You should file in the Northern District if you were convicted and sentenced in one of these

19 counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

20 San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in

21 this district if you are challenging the manner in which your sentence is being executed, such as loss of

22 good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

23        If you are challenging your conviction or sentence and you were not convicted and sentenced in

24 one of the above-named fifteen counties, your petition will likely be transferred to the United States

25 District Court for the district in which the state court that convicted and sentenced you is located. If

26 you are challenging the execution of your sentence and you are not in prison in one of these counties,

27 your petition will likely be transferred to the district court for the district that includes the institution

28 where you are confined. Habeas L.R. 2254-3(b).

PET. FOR WRIT OF HAB. CORPUS        - 1 -

1  Who to Name as Respondent

2         You must name the person in whose actual custody you are.  This usually means the Warden or

3  jailor.  Do not name the State of California, a city, a county or the superior court of the county in which

4  you are imprisoned or by whom you were convicted and sentenced.  These are not proper

5  respondents.

6         If you are not presently in custody pursuant to the state judgment against which you seek relief

7  but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8  custody you are now and the Attorney General of the state in which the judgment you seek to attack

9  was entered.

10 A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

11        1.  What sentence are you challenging in this petition?

12             (a)    Name and location of court that imposed sentence (for example; Alameda

13                    County Superior Court, Oakland):

14             Santa Clara County            San Jose, CA
                 Superior Court
15               Court                              Location

16             (b)    Case number, if known ___127919___

17             (c)    Date and terms of sentence ___1989 / 17 years to life___

18             (d)    Are you now in custody serving this term?  (Custody means being in jail, on

19                    parole or probation, etc.)        Yes _X_    No _____

20                    Where?

21                    Name of Institution: Correctional Training Facility

22                    Address: P.O. Box 689, Z117L, Soledad, CA 93960-0689

23        2.  For what crime were you given this sentence?  (If your petition challenges a sentence for

24  more than one crime, list each crime separately using Penal Code numbers if known.  If you are

25  challenging more than one sentence, you should file a different petition for each sentence.)

26  Second-degree murder w/use of weapon

27

28

PET. FOR WRIT OF HAB. CORPUS        - 2 -

3. Did you have any of the following?

Arraignment:                                  Yes __X__      No _____

Preliminary Hearing:                          Yes __X__      No _____

Motion to Suppress:                           Yes __?__      No _____

4. How did you plead?

Guilty __x__    Not Guilty _____    Nolo Contendere _____

Any other plea (specify) Stipulated to second-degree murder or manslaughter as decided by Judge.

5. If you went to trial, what kind of trial did you have?

Jury _____      Judge alone __X__    Judge alone on a transcript _____

6. Did you testify at your trial?               Yes __X__      No _____

7. Did you have an attorney at the following proceedings:

(a)    Arraignment                           Yes __X__      No _____

(b)    Preliminary hearing                   Yes __X__      No _____

(c)    Time of plea                          Yes __x__      No _____

(d)    Trial                                 Yes __X__      No _____

(e)    Sentencing                            Yes __X__      No _____

(f)    Appeal                                Yes __X__      No _____

(g)    Other post-conviction proceeding      Yes _____      No _____

8. Did you appeal your conviction?              Yes __X__      No _____

(a)    If you did, to what court(s) did you appeal?

Court of Appeal                          Yes __X__      No _____

Year: 1991        Result: Judgment affirmed

Supreme Court of California              Yes _____      No _____

Year: _____     Result: _____

Any other court                          Yes _____      No _____

Year: _____     Result: _____

(b)    If you appealed, were the grounds the same as those that you are raising in this

petition?    Different issue.    Yes _____    No_____

(c)    Was there an opinion?    Yes _X_    No_____

(d)    Did you seek permission to file a late appeal under Rule 31(a)?

Yes _____    No_X_

If you did, give the name of the court and the result:

_____

_____

9. Other than appeals, have you previously filed any petitions, applications or motions with respect to this conviction in any court, state or federal?    Yes _____    No_____

[Note: If you previously filed a petition for a writ of habeas corpus in federal court that challenged the same conviction you are challenging now and if that petition was denied or dismissed with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit for an order authorizing the district court to consider this petition. You may not file a second or subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28 U.S.C. §§ 2244(b).]

(a)    If you sought relief in any proceeding other than an appeal, answer the following questions for each proceeding. Attach extra paper if you need more space.

I.    Name of Court: _Santa Clara Superior Court_

Type of Proceeding: _Writ of habeas corpus_

Grounds raised (Be brief but specific):

a. _GOvernor failed to timely and definitively reverse grant of parole._

b. _____

c. _____

d. _____

Result: _Granted_    Date of Result: _SEP. 25, 2006_

II.    Name of Court: _Appellate Court_

Type of Proceeding: _Appeal_

Grounds raised (Be brief but specific):

PET. FOR WRIT OF HAB. CORPUS        - 4 -

a. Governor's reversal of December 2005 grant of parole
appealed to reverse November 2002 grant of parole.

#b. _____

#c. _____

#d. _____

Result: Superior Court Reversed        Date of Result: 12/20/07

III.    Name of Court: State Supreme Court _____

Type of Proceeding: Petition for Review _____

Grounds raised (Be brief but specific):

a. Governor failed to timely reverse November 2002
grant of parole.

b. Governor failed to provide Petitioner the required
definitive statement of denial.

c. _____

d. _____

Result: _____DENIED (EXHIBIT"E") Date of Result: MARCH 19, 2008

IV.    Name of Court: _____

Type of Proceeding: _____

Grounds raised (Be brief but specific):

a. _____

b. _____

c. _____

d. _____

Result: _____    Date of Result: _____

(b)    Is any petition, appeal or other post-conviction proceeding now pending in any court?

Yes _____    No  X

Name and location of court: _____

B. GROUNDS FOR RELIEF

State briefly every reason that you believe you are being confined unlawfully. Give facts to
support each claim. For example, what legal right or privilege were you denied? What happened?
Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

PET. FOR WRIT OF HAB. CORPUS        - 5 -

1  need more space. Answer the same questions for each claim.

2       [Note: You must present ALL your claims in your first federal habeas petition. Subsequent

3  petitions may be dismissed without review on the merits. 28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4  499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5       Claim One: Petitioner's state and federal right to due process was
         violated when the Governor failed to timely issue a definitive
6        reason for reversing Petitioner's grant of parole.

7       Supporting Facts: The State of California is refusing to release

8        Petitioner from prison despite the Governor's April 2007 failure

9        to timely issue a definitive statement reversing his reinstated

10       2002 grant of parole. (Con't. page 8.)

11      Claim Two: N/A

12

13      Supporting Facts:

14

15

16

17      Claim Three: N/A

18

19      Supporting Facts:

20

21

22

23      If any of these grounds was not previously presented to any other court, state briefly which

24  grounds were not presented and why:

25       N/A

26

27

28

PET. FOR WRIT OF HAB. CORPUS        - 6 -

1        List, by name and citation only, any cases that you think are close factually to yours so that they

2    are an example of the error you believe occurred in your case.  Do not discuss the holding or reasoning

3    of these cases:

4        See page 8 et. al. _____

5    _____

6    _____

7    Do you have an attorney for this petition?         Yes_____    No__X__

8    If you do, give the name and address of your attorney:

9    _____

10        WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11    this proceeding.  I verify under penalty of perjury that the foregoing is true and correct.

12

13    Executed on __April 24,__ 2008         _____

14                 Date                    Signature of Petitioner

15

16

17

18

19

20    (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS      - 7 -

INTRODUCTION

The issue before the court in this matter is can the Governor, as was done in this case, impliedly reverse a prisoner's grant of parole, and do so without providing the inmate a written definitive statement identifying itself as delineating the reasons for that specific parole grant reversal, and, therefore does that failure deprive the inmate of is owed state and federal procedural due process by failing to provide him an express, clear statement of reasons which the inmate can use (needs) to appeal that reversal of parole? Specifically, Petitioner alleges in this case, the California Court unconstitutionally found the Governor was permitted to exercise his Article V, Section 8(b), Penal Code § 3041.2 authority to reverse this Petitioner's grant of parole without providing him a definitive statement of reasons expressly addressing the reasons for that specific reversal decision. A decision which unreasonably deprived Petitioner of his owed procedural due process.

STATEMENT OF FACTS

This case arose when the California Governor had the coincidental opportunity, due to a court decision, to simultaneously review the Board's 2002 and 2005 grants of parole to Petitioner. On December 7, 2005, the Board granted parole to Petitioner for the second time. That decision came before the Governor for his consideration during April 2006. (See Exhibit A.) On April 27, 2006, the Governor issued a letter to Petitioner which reversed that grant of parole. A letter which closes with the express statement, "Accordingly, I REVERSE the Board's 2005 decision to grant parole to Mr. Huynh." As _even_ the appellate court noted, "The Governor's April 27, 2006, reversal of the grant of parole [ ] did not expressly direct itself to the 2002 grant of parole…" (Exh. A, p. 4.)

Prior to the above, in November 2002, the Board granted Petitioner parole. In April 2003, the Governor reversed that initial grant of parole. Petitioner appealed and the trial court granted relief. The State appealed that trial court decision, and after a lengthy period, on April 4, 2006, the California Sixth District Appellate Court in Case No. H02888 affirmed the trial court's grant of relief, but modified it. While his 2003 reversal was vacated, the Governor was allowed by the State Superior Court (Exhibit B) to again review the reinstated grant of parole. Upon remititure, the case was retuned to the trial court, which on April 14, 2006, by written order vacated the 2003 parole

1   grant reversal and remanded the mater to the Governor for reconsideration, with the caveat, "if he so

2   chooses."

3         After a 60+ day period, Petitioner inquired of his Correctional Counselor as to whether the

4   Governor had responded to the reinstatement of his November 2002 grant of parole, and was

5   informed that the Governor had not responded. Petitioner appealed and his writ was filed in the trial

6   court on September 11, 2006. Subsequent to an Order To Show Cause, Respondent's Answer and

7   Petitioner's Traverse were filed, and the writ granted. (Exhibit C.) Petitioner's immediate release

8   was ordered.

9         Respondent appealed, claiming that the Governor's April 27, 2006, letter reversing of

10   Petitioner's December 7, 2005, grant of parole was meant to also apply to the reinstated November

11   2002 grant of parole, even though that November 2002 grant is <u>never</u> directly mentioned in the

12   Governor's April 27, 2006, letter. Acting unreasonably, in Case No. H030370, the Sixth Appellate

13   panel agreed, even after acknowledging that the Governor never once mentioned the 2002 grant of

14   parole, and after noting that all the facts referenced in that letter, other than those which are crime

15   related, clearly refer to post-2002 activities. (Exhibit D.) The appellate court based its conclusion

16   solely on the fact it appears that at sometime the Governor['s staff] had read the appellate court's

17   February 3, 2006, order in Case No. H028888, reinstating Petitioner's Grant of parole, disregarding

18   the Governor's failure to provide Petitioner a definitive statement of reasons deprives him of the

19   ability to substantively appeal that decision.

20         Both state and federal procedural due process standards require a prisoner being denied

21   parole receive a <u>definitive</u> statement of the reasons for that denial, to facilitate any desired appeal.

22   Those due process standards do not permit an implied (vicarious) denial never mentioning the grant

23   of parole at issue, thereby requiring a prisoner be able to somehow (clairvoyantly) discern both their

24   being denied parole and the issues supporting that unmentioned denial detailed knowledge of which

25   they require to properly appeal a (Governor's) decision to deny parole.

26                                 PRAYER

27   WHEREFORE, Petitioner prays this court:

28   1. Issue an Order to Show Cause to determine if his being held in prison despite the

1    Governor's failure to timely issue a definitive letter specifically reversing his April 2006 reinstated

2    November 2002 grant of parole deprived him of his federally protected right to due process, and

3          2.  Upon confirming the state's failure to timely issue a definitive letter statement reversing

4    his reinstated November 2002 grant of parole find the Governor no longer has discretionary

5    authority over this matter, and

6          3.  Order Petitioner's immediate release, within 72 hours, from prison, and immediate

7    deportation to France, his country of citizenship.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LEGAL ARGUMENT

I.  PAROLE DENIAL OR REVERSAL REQUIRES THE
AFFECTED PRISONER RECEIVE A DEFINITIVE
STATEMENT OF THE REASONS FOR THEIR BEING
DENIED PAROLE.

Penal Code § 3041.2 notes that "[i]f the Governor decides to reverse…a parole decision of a

parole authority pursuant to subdivision (b) of Section 8 of Article VI of the Constitution, he or she

shall send a written statement to the inmate specifying the reason for his or her decision.

Referencing the Governor's authority, and that requirement, the State Supreme Court, in In re

Rosenkrantz (2002) 29 Cal.4th 616 654-655, equates that requirement placed on the parole authority

with that imposed by their previous decision in In re Sturm (1974) 11 Cal.3d 258, 273, wherein the

court required the prisoner being denied be provide[d] a definitive[1] written statement of [the] reasons

for [being] den[ied] parole." In Greenholtz v. Inmates of Nebraska's Penal and Correctional

Complex, 442 U.S. 1, 60 L.Ed.2d 668, the High Court held procedural due process was satisfied

"when parole is denied," i.e. reversed, when the denying authority "informs the inmate in what

respects he falls short of qualifying for parole, after an opportunity to be heard."

The State Supreme Court, however, de facto elaborated on the Greenholtz standard, noting in

Sturm, 11 Cal.3d at 269, "It follows that the fundamental question whether a statement of reasons is

required as a matter of fairness must be answered in the affirmative if such a statement is

indispensable to an effective remedy against infringement upon the right of due consideration." The

Sturm court then noted the reason for this statement, as, "The basic remedy available to correct

arbitrary [parole] [a]uthority action is the writ of habeas corpus. (Citation)  A plea for such relief,

however, will not receive judicial consideration unless the Petitioner alleges with particularity the

circumstances constituting the People's claimed wrongful conduct and demonstrates how he is

prejudiced thereby.  (In re Swain (1949) 34 Cal.2d 300.)  It is unlikely that an inmate seeking to

establish his application for parole was arbitrarily denied can make necessary allegations with the

---

[1] Definitive means "to define…or specify precisely," something "fully differentiated or developed," and "authoritative and apparently exhausted."  It must "serve as a perfect example." (Webster's Collegiate Dictionary, Eleventh Edition, 2005.)  A standard the Governor's April 27, 2006, alleged implied addressing of Petitioner's 2002 grant of parole fails to satisfy.

requisite specificity unless he has some knowledge of the reasons therefore." In their decision, the

Sturm court relied on Kent v. United States (1966) 383 U.S. 541, 16 L.Ed.2d 84, 86 S.Ct. 1045,

which was noted to hold, "a standard of reasons for the denial is indispensable to a due process

review thereof." (Id. at 269.) Sturm then noted, "[I]nmates may be denied the opportunity to

formulate a persuasive application for relief if they are unaware of the reasons why parole was

denied. (See In re Swain, supra, 34 Cal.2d 300)." (Id. at 270.) Therefore, Sturm at 270, held "In

light of Kent, the mere recognition these considerations leads inexorably to the conclusion that due

process requires that the [parole] [a]uthority support its determinations with a statement of its

reasons, therefore, and of course do so in a manner recognizable by the inmate population at large."

In this matter, the appellate court unreasonably asserted that a letter delineating the decision

to deny the Board's December 2005 grant of parole to Petitioner should have sufficed as a statement

also reversing the Parole Board's November 2002 parole grant, as the state appellate court found it

clear that the writer of that letter must have read its decision in Case No. H028888. A letter which

mentions only the Board's December 7, 2005, grant of parole and some facts surrounding the post-

2002 period. The procedural due process question before this Court is, can a pro-per prisoner, be

expected to clairvoyantly discern that it was the Governor's intent to reverse two grants of parole

from a letter expressly reversing only a single grant of parole, which raises the further issue as to

whether under these conditions Petitioner would be able to prepare a "persuasive application for

relief for the implied reversal of the second (unmentioned) parole grant." See Sturm at 272, "[T]he

absence of a definitive written statement of its reasons for denying parole...effectively deprive[d]

thi[is] inmate of procedural due process of law." (Emphasis added.)

Since the 30 day period during which the Governor had the discretionary authority to review

the successfully appealed (November 2002) (reinstated) grant of parole has long expired, the relief in

this matter would be to immediately release Petitioner, now almost 70 years old, and allow his

deportation to France.

II. THE GOVERNOR'S FAILURE TO PROVIDE A DEFINITIVE WRITTEN STATEMENT OF REASONS FOR REVERSING PETITIONER'S 2002 GRANT OF PAROLE DEPRIVED HIM OF HIS FEDERALLY PROTECTED LIBERTY INTEREST.

1    Under well-settled law, Petitioner has a federally protected liberty interest in parole.  (In re
2    Rosenkrantz 29 Cal.4th; Sass v. California Parole Board (9th Cir. 2007) 401 F.3d 1123, 1127;
3    Hayward v. Marshall (9th Cir. 2008) 2008 U.S. App. Lexis 40, * 12 - * 14.)  Accordingly, "by
4    reversing [Petitioner's] parole grant, the Governor deprived him of a constitutionally protected
5    liberty interest.  [Therefore, one] primary question[ ] [is] whether California provided the
6    constitutionally required procedural safeguard when depriving [Petitioner] of his liberty interest."
7    (Hayward at * 13.)  By failing to provide Petitioner a definitive statement of reasons for his parole
8    reversal decision, the Governor deprived him of his constitutionally required procedural safeguards.

9

10                                     CONCLUSION
11    Petitioner respectfully submits that as he was deprived of procedural due process owned him
12    under both Greenholtz, 442 U.S. 1 and In re Sturm, 11 Cal.3d at 273, his writ be granted and his
13    immediate release from prison be ordered.

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A

**INDETERMINATE SENTENCE PAROLE RELEASE REVIEW**
(Penal Code Section 3041.2)

**NAM HUYNH E-30183**
**SECOND-DEGREE MURDER**

**AFFIRM:**                           _____

**MODIFY:**                           _____

**REVERSE:**                          _____X_____

On November 8, 1988, 50-year-old Nam Huynh murdered his estranged wife 31-year-old Lam Huynh.

The Huynhs were living apart and seemingly in the process of divorcing. On the day of the murder, Mr. Huynh went to Ms. Huynh's home in San Jose. Once there, it somehow was decided that the two would drive to another location to, according to Mr. Huynh, talk about visitation of their three children.

They each drove separately, stopping on a street not far from where Ms. Huynh lived. Ms. Huynh stayed in her parked car, only opening her window by a couple inches. Mr. Huynh, who was armed at the time, then got out of his car and blocked Ms. Huynh's car by standing in front of it. After Ms. Huynh honked her horn at him, he began to strike his gun against her driver-side window. When the window did not break, he used his gun to shoot through it. Ms. Huynh was struck by the bullet. As her car drifted across the street, he followed, shooting her four more times, reloading the gun once.

When police arrived at the scene, they saw Mr. Huynh sitting on the curb and Ms. Huynh laying over the passenger seat of the car, bleeding profusely and not moving. Ms. Huynh was transported to a hospital where she was pronounced dead.

Following his arrest and court trial, Mr. Huynh was found guilty of second-degree murder with the use of a firearm and sentenced to 15 years to life in prison, plus an additional two-year term for the firearm use.

A French citizen born in Vietnam, Mr. Huynh had no documented criminal history when he moved to California in the 1980s, nor had he ever before been convicted for any sort of violent or assaultive conduct when he murdered Ms. Huynh. Mr. Huynh himself, however, according to the probation report, admitted to having once hit Ms. Huynh "several times" several months preceding the murder, and although it is not exactly clear from the record before me, may have resulted in Ms. Huynh obtaining a restraining order against him at some time before the murder.

15

Nam Huynh, E-30183
Second-Degree Murder
Page 2

Since his incarceration 17-plus years ago, Mr. Huynh has managed to maintain a discipline-free conduct record. He also has made efforts to enhance his ability to function within the law upon release. Although an educated business owner before his incarceration, Mr. Huynh pursued and earned his GED in prison, has completed an entrepreneur program, has taken multiple health-related courses, and has held various work assignments within the institutional setting. He has availed himself of available self-help and therapy, including Anger Management, Path of Peace Seminar, Buddhist Meditation Studies program, "How to Become a Father," and, although he has no history of drug or alcohol problems, substance-abuse-related programming.

Moreover, Mr. Huynh says that he accepts responsibility and is truly sorry for what he did. Consistent with such statements, his 2004 mental-health evaluation notes that he has "deep remorse" and that, when discussing the murder during the 2004 evaluation, he began to cry and had trouble composing himself. Various other correctional and mental-health evaluators have given Mr. Huynh favorable reports, inclusive of low risk assessments, as well.

Mr. Huynh also has made arrangements upon release that include a solid short-term plan to reside with a friend in her three-bedroom home in Santa Clara County and an alternate plan to live with another friend in Campbell, California. Because Mr. Huynh is subject to deportation to France upon release, he has also made plans to live there with a friend. Mr. Huynh was the owner of a fish-market business before his incarceration, has held various work assignments in prison, and appears to be eligible for Social Security benefits of some amount in the United States and for retirement income of some sort in France.

But despite the factors tending to support his parole suitability at this time, Mr. Huynh committed an especially heinous second-degree murder because his actions beforehand demonstrated some level of premeditation. While Mr. Huynh's description of the murder has consistently been and remains that he was angry at Ms. Huynh for not allowing him to see their children, and that he went to her home that morning to talk with her, both the probation report and the 2002 Life Prisoner Evaluation state that Mr. Huynh admitted that his plan on the day of the murder was to shoot Ms. Huynh and then himself. Additionally, after shooting Ms. Huynh once, her car, according to the probation report, began coasting across the street, away from Mr. Huynh—providing him a clear opportunity to discontinue his conduct. Instead of ceasing, however, as documented in the probation report and other materials in the record before me, Mr. Huynh proceeded to follow the car and fire more shots at Ms. Huynh, reloading his gun at some point, striking her four more times. According to the autopsy, Ms. Huynh was shot a total of five times; two bullets entered the left side of her neck, one entered her left upper arm, another entered her abdomen, and the fifth bullet passed through her left forearm.

And Mr. Huynh went on his murderous shooting spree in an area where other people were present, as evidenced by information in the probation report regarding witnesses to the murder, making his actions in carrying out this murder even more atrocious because he put multiple people at risk of death or injury since people at or near the scene could have been harmed by either the gunshots or the moving car. The gravity alone of the second-degree murder committed

*16*

Nam Huynh, E-30183
Second-Degree Murder
Page 3

by Mr. Huynh is sufficient for me to conclude presently that his release from prison would pose an unreasonable public-safety risk.

I have considered the circumstances under which Mr. Huynh committed this murder and the conclusion of the 2005 Board, as well as that of previous Boards, that Mr. Huynh murdered his estranged wife as a result of significant stress in his life. While I do not dispute that Mr. Huynh was under significant stress at that time—a culmination of a two-year period in which his marriage was destroyed, his family broken, his finances taken, and his home and business lost— or that the existence of such may be a mitigating factor, it does not, in view of the totality of circumstances in this case and the gravity of the murder Mr. Huynh committed, cause the scales currently to tip in favor of his parole suitability. The same is true of the 2005 Board's finding that Mr. Huynh now has a reduced probability of recidivism due to his age, maturation, growth, and recent surgery involving a six-way heart bypass. Mr. Huynh indeed is 68 years old, and may not now be in the best of health, but any reduced likelihood of his reoffending is currently insufficient given that he was 50, an age of relative maturity, when he murdered the mother of his children by firing a gun at her five times.

A representative from the Santa Clara County District Attorney's Office attended Mr. Huynh's 2005 parole-consideration hearing and opposed his release, as did the San Jose Police Department in a 2005 letter to the Board.

Although Mr. Huynh has made creditable gains during his incarceration, given the current record before me and after carefully considering the very same factors the Board must consider, I find the gravity of the murder he committed presently outweighs the positive factors tending to support his parole suitability. Accordingly, because I believe his release from prison would pose an unreasonable risk of danger to society at this time, I REVERSE the Board's 2005 decision to grant parole to Mr. Huynh.

Decision Date: 4/27/06

ARNOLD SCHWARZENEGGER
Governor, State of California

17

# EXHIBIT B

*/8*

1
2
3
4                                                       FILED

                                                        APR 1 4 2006
5             SUPERIOR COURT OF CALIFORNIA        KIRI TORRE
                                                  Chief Executive Officer/Clerk
                                                  Superior Court of CA, County of Santa Clara
6                     COUNTY OF SANTA CLARA        BY _____
                                                                      DEPUTY
7
8    ─────────────────────────────────
9    In re                            )
                                      )    No.: 127919
10        NAM HUYNH,                   )
                                      )    ORDER
11   On Habeas Corpus                 )
                                      )
12   ─────────────────────────────────
13
14        Pursuant to the decision of the Sixth District of the Court of

15   Appeal, (H028888,) it is hereby ordered that the Governor's decision

16   to deny parole to Petitioner be vacated.  The Governor may reconsider

17   the matter if he so chooses.  Should the Governor exercise his

18   authority under Article V, section 8, subdivision (b) of the

19   California Constitution and Penal Code section 3041.2 he must do so

20   in accordance with the views expressed in the opinion of the Sixth

21   District, and, this Court's order as affirmed and modified.

22
23
24   DATED:  _April 14_, 2006     _Linda R. Condron_
25                                LINDA R. CONDRON
                                  JUDGE OF THE SUPERIOR COURT
26
     cc:  Petitioner at CTF Soledad
27        Petitioner's Attorney (Ric Squaglia)
          Attorney General (Scott Mather)
28

                                                                    19

# EXHIBIT C

F I L E D

SEP 2 5 2006

KIRI TORRE
Chief Executive Officer
Superior Court of CA County of Santa Clara
BY_____DEPUTY

1

2

3

4

5    SUPERIOR COURT OF CALIFORNIA

6    COUNTY OF SANTA CLARA

7

8    _____
                                        )
9    In re                              )    No.: 127919
                                        )
10        NAM HUYNH,                     )
                                        )    ORDER
11   On Habeas Corpus                    )
     _____)

12

13

14       The habeas corpus petition of NAM HUYNH is hereby GRANTED.  IT

15   IS ORDERED that Petitioner be released per the terms of his 2003

16   parole grant within five days of the Attorney General's receipt of

17   this order.

18       On April 18, 2003 Governor Gray Davis reversed the March 19,

19   2003 BPT decision granting Petitioner parole.  Following a grant of

20   the habeas petition filed in July and an appeal to the 6th District,

21   the Governor's order reversing the BPT decision was vacated and the

22   matter remanded to the trial court.   Thereafter, an order issued on

23   April 14, 2006 which providing that the Governor may reconsider the

24   matter "if he so chooses" within his authority under PC § 3041.2.  No

25   such action was undertaken, and the statutory (jurisdictional) time

26   for exercise of that power has passed.

27       Although Respondent now claims that the Governor took action to

28

1

21

1    reverse Petitioner's 2003 parole grant in April 27, 2006 as part of

2    his review of a 2005 parole grant, that is plainly not the case.

3    Every aspect of that review unambiguously refers only to the Board's

4    2005 findings and record and concludes with an equally unequivocal

5    pronouncement: "I REVERSE the Board's 2005 decision to grant parole

6    to Mr. Huynh."

7         There is also pending before this Court a request from

8    Petitioner's appointed counsel for leave to file a supplemental

9    petition in this and in Petitioner's separate petition filed, in pro

10   per, on September 11, 2006.  This appears to be, in part, an effort

11   to join the recent Petition to the instant proceedings.  This Court

12   will, however, continue to treat the two petitions separately and

13   will address counsel's request to file a supplemental petition in a

14   separate Order in the later case.

15        If, however, counsel for Petitioner wishes to address this Court

16   further on the narrow jurisdictional issue surrounding Petitioner's

17   2003 parole grant (H028888), counsel may file a motion for

18   reconsideration within five days or receipt of this Order (It is

19   unclear from counsel's request for leave to file a supplemental

20   petition whether the additional state and federal authorities

21   contemplated therein were on this point or in relation to the merits

22   of the Governor's April 27, 2006 action).

23

24   DATED: _Sept 22_, 2006          _Linda R. Condron_

25                                   LINDA R. COMDRON
                                     JUDGE OF THE SUPERIOR COURT

26   cc:  Petitioner (@ C.T.F. Soledad)
          Petitioner's Attorney (Keith Sugar)
27        Attorney General (Scott Mather)
          CJIC

28

2

22

# EXHIBIT D

COPY

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

*California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

Court of Appeal - Sixth App. Dist.

**FILED**

DEC 20 2007

MICHAEL J. YERLY, Clerk

By _____
DEPUTY

| | |
|---|---|
| In re NAM VAN HUYNH, <br><br> on Habeas Corpus. | H030670 <br> (Santa Clara County <br> Super.Ct.No. 127919) |

At issue in this case is whether the Governor's April 2006 written reversal of the Board of Parole Hearing's 2005 grant of parole to Nam Van Huynh under article V, section 8, subdivision (b), of the California Constitution and Penal Code section 3041.2, subdivision (a), also operated as a reversal of the Board of Prison Term's prior 2002 grant of parole, which had previously been reversed by Governor Davis.[1] Shortly before the Governor's 2006 reversal, this prior reversal had been vacated by the trial court and remanded back to the Governor for reconsideration pursuant to our direction as a result of the Warden's earlier appeal of the trial court's order granting Huynh habeas relief.[2] The 2006 gubernatorial reversal did not specifically reference the 2002 grant of parole, expressly reversing only the 2005 grant.

Notwithstanding this omission, which appears to be inadvertent, we conclude that the Governor's 2006 reversal of the grant of parole also operated to reverse the 2002

---

[1] The Board of Prison Terms was abolished on July 1, 2005, and replaced with the Board of Parole Hearings, hereafter the "Board." (Pen. Code, § 5075, subd. (a).) Further unspecified statutory references are to the Penal Code.

[2] (*In re Huynh* (Feb. 3, 2006, H028888) [nonpub. opn.] (*Huynh II*).)

grant, then before the Governor on remand. We so conclude because the substance of the 2006 reversal complied with the directives of our prior opinion in *Huynh II* and the trial court's order on remand and was made within 30 days of the vacation of the 2002 reversal, consistently with the time for gubernatorial review of a Board decision to grant parole under article V, section 8, subdivision (b), and section 3041.2, subdivision (a). Accordingly, we here reverse the trial court's grant of habeas relief concerning the 2002 grant of parole.[3]

## STATEMENT OF THE CASE

I.    *Factual Background*

In 1989, Nam Van Huynh was convicted of second degree murder for killing his wife and was sentenced to an indeterminate term of 15 years to life in prison, plus two years for the use of a firearm.[4] In 2002, the Board decided to grant Huynh parole. That decision became final on March 19, 2003. In April 2003, then-Governor Gray Davis reversed the grant of parole citing various factors favoring Huynh's unsuitability for

---

[3] Our opinion does not address whether the Governor's reversal of the Board's 2005 grant is supported by some evidence in the record or is consistent with legal principles applicable to his exercise of authority under article V, section 8, subdivision (b), of the California Constitution and section 3041.2, subdivision (a). The trial court, by separate order from that on appeal here, concluded that it was not. That order is the subject of the Warden's later appeal in *In re Huynh* (H031395, app. pending), our opinion in which will be forthcoming. Thus, our opinion in the instant case has no bearing on the outcome of that appeal, which reaches the merits of the Governor's reversal of Huynh's second grant of parole in 2005.

[4] Holding that Huynh's waiver of preliminary examination, and his submission to a court trial based on police reports, taped statements, and his own testimony in exchange for the elimination of special circumstances and exposure to first degree murder were not tantamount to a plea of guilt, and that the absence of a waiver of the right to self-incrimination, though error, was not prejudicial, we affirmed the judgment of conviction on direct appeal in *People v. Huynh* (1991) 229 Cal.App.3d 1067, 1076-1080. There was also a related habeas proceeding addressed in that published opinion in which we granted relief and remanded for further proceedings. That matter is not relevant here. (*Id.* at pp. 1080-1084.)

25

parole, among them the gravity of the commitment offense. Huynh then filed a petition for writ of habeas corpus in the trial court, which was granted.

Acting for the Warden, Governor Arnold Schwarzenegger appealed from the order.[5] We concluded in an unpublished opinion that while some of the factors upon which the previous Governor had relied in reversing the Board were unsupported by the record, and while he had also failed to consider other factors supporting suitability for parole, it was nevertheless "equivocal" whether the Governor would still have reversed the Board based solely on the gravity of the commitment offense.[6] (*Huynh II, supra,* H028888.) We accordingly affirmed the trial court's grant of habeas relief but modified the order and directed that the previous Governor's 2003 reversal of the 2002 grant of parole be vacated and the matter remanded to Governor Schwarzenegger for a determination of this question in accordance with due process.

Upon our remittitur, the case was returned to the trial court, which, on April 14, 2006, by written order vacated the Governor's 2003 parole grant reversal and remanded the matter back to the Governor to reconsider the Board's 2002 grant of parole "if he so [chose]," consistently with our direction. Neither our opinion nor the trial court's order on remand set a specific deadline for the Governor's reconsideration of the 2002 grant of parole.

Meanwhile, at another hearing held in December 2005, the Board again decided to grant Huynh parole. That decision became final as to the Board on April 6, 2006, and Huynh was so informed by letter on April 13, 2006. The letter also informed Huynh of the Governor's right to review the Board's decision.

---

[5] Per section 1477, the writ in a habeas proceeding must be directed to "the person having custody of or restraining the person on whose behalf the application is made," in this case the Warden of the prison in which Huynh is incarcerated. (*Huynh II, supra,* H028888.)

[6] We discuss these specific factors in more detail in the analysis below.

On April 27, 2006, Governor Schwarzenegger exercised his authority under article V, section 8, subdivision (b), of the California Constitution and section 3041.2, specifically stating, "I REVERSE the Board's 2005 decision to grant parole to Mr. Huynh," based on the conclusion that the gravity of the commitment offense "presently outweighs the positive factors tending to support" parole suitability. The Governor's April 27, 2006 reversal of the grant of parole thus did not expressly direct itself to the 2002 grant of parole, Governor Davis's prior reversal of which had been vacated by the trial court's order on remand in *Huynh II*.

## II.    Procedural Background

Following the Governor's 2006 reversal, Huynh, in pro se, filed a "motion of immediate release from prison" in the trial court, which the court construed as a petition for writ of habeas corpus. Huynh's request for relief was based on the contention that the Governor had not timely acted on remand to reverse the Board's 2002 grant of parole, his 2006 reversal being directed only to the 2005 grant of parole, and, thus, Huynh should be immediately released on parole pursuant to the 2002 grant under section 3041.2. The trial court issued an order to show cause, the Warden filed a return, and Huynh a traverse. Without holding an evidentiary hearing, the court granted writ relief, ordering Huynh's immediate release and rejecting the Warden's contention that the Governor's April 2006 reversal of the Board's 2005 grant of parole also operated to reverse the 2002 grant.

The Warden timely appealed from the trial court's order under section 1507, providing for direct appeal of a superior court order made upon the return of a writ of habeas corpus.[7]

---

[7] The Warden also petitioned for a writ of supersedeas staying the order, which we granted.

4

DISCUSSION

*I.    Issue on Appeal and Standard of Review*

The sole issue on appeal is whether the Governor's April 27, 2006 reversal of the 2005 grant of parole also operated to reverse the 2002 grant, which was then before him on remand by reason of the trial court's April 14, 2006 order vacating the previous Governor's reversal in accordance with our opinion in *Huynh II,* or instead whether Huynh was entitled to immediate release on parole for the Governor's failure to timely act upon the reinstatement of the 2002 grant of parole.

The parties debate the applicable standard of review on appeal, the Warden contending for de novo review and Huynh urging review for abuse of discretion or under the substantial evidence test because, he argues, the Warden challenges the sufficiency of the evidence to support the trial court's order, which made a factual determination. We reject Huynh's contention in this regard and will independently review the trial court's order.

" 'The petitioner in a habeas corpus proceeding bears the ultimate burden of proving the factual allegations that serve as the basis for his or her request for habeas relief. [Citation.]  Once the issues of fact have been joined by respondent's filing of the return to the petition and the petitioner's filing of the traverse, the court may deny relief if it concludes that the petitioner has not alleged facts sufficient to warrant relief. [Citation.]  If relief depends upon the resolution of disputed issues of fact, the court may order an evidentiary hearing and make findings of fact with regard to such issues. [Citation.]  The various exhibits that may accompany the petition, return and traverse do not constitute evidence, but rather supplement the allegations to the extent they are incorporated by reference. [Citation.]  At the evidentiary hearing, such exhibits are subject to admission into evidence in accordance with generally applicable rules of evidence. [Citation.]' ([*In re Rosenkrantz* (2002) 29 Cal.4th 616, 675 (*Rosenkrantz*)].)" (*In re Smith* (2003) 114 Cal.App.4th 343, 360.)

5

28

Where the court resolves factual issues in this manner, those determinations are afforded deference on review. But where, as here, the court below did not conduct an evidentiary hearing and instead based its decision on the filed pleadings and exhibits, we conduct an independent review of the record. (*In re Smith, supra,* 114 Cal.App.4th at pp. 360-361.) Moreover, to resolve the issue on appeal in this case, it is necessary for us to construe our opinion in *Huynh II* and the Governor's 2006 decision reversing the grant of parole, without consideration of extrinsic evidence, and apply legal principles to our conclusions in this regard. These functions do not require deference to any factual determinations of the trial court, of which there were none here in any event. Thus, the matter presented is one of law, which we decide anew. (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 799; *Hurtado v. Statewide Home Loan Co.* (1985) 167 Cal.App.3d 1019, 1023-1024, disapproved on other grounds in *Shamblin v. Brattain* (1988) 44 Cal.3d 474, 479 [reasons for conducting independent appellate review of questions of law include that appellate court is in at least as good a position to address such questions and the promotion of statewide consistency in the interpretation and application of law and the articulation of judicial policy]; *In re Lowe* (2005) 130 Cal.App.4th 1405, 1421 [on judicial review of parole decisions, appellate court reviews issues of law de novo].)

II.    *The Applicable Legal Framework*

To put the issue on appeal here in context and to provide a greater understanding of our decision in *Huynh II*, we set out the general legal principles applicable to parole decisions affecting prisoners serving indeterminate life terms.

In accordance with section 3041, the Board makes determinations of parole suitability in the first instance for inmates serving indeterminate life sentences. (*Rosenkrantz, supra,* 29 Cal.4th at p. 653.) "If it finds the inmate suitable, the Board establishes a parole release date. [Citations.] Conversely, if the Board concludes that public safety requires a lengthier period of incarceration, parole will be denied." (*In re Burns* (2006) 136 Cal.App.4th 1318, 1325.) "The Board has broad discretion, must

6

29

normally set parole release in a manner that provides uniform terms for offenses of similar gravity and magnitude with respect to the public safety [citations], and must set a parole release date unless it determines that the gravity of the current convicted offense or offenses, or their timing and gravity, are such that public safety requires a more lengthy period of incarceration [citations]." (*In re Elkins* (2006) 144 Cal.App.4th 475, 487; § 3041, subds. (a) & (b).)

Section 3041, subdivision (a), directs the Board to establish criteria for the setting of parole release dates, which appear in title 15 of the California Code of Regulations. (Cal. Code Regs., tit. 15, § 2400 et seq.)[8] Under section 3041, subdivision (b), and the Regulations, the Board must grant parole unless it determines that public safety requires a lengthier period of incarceration for the individual because of the gravity of the offense underlying the conviction. (*Rosenkrantz, supra,* 29 Cal.App.4th at p. 654.) "Accordingly, parole applicants in this state have an expectation that they will be granted parole unless the Board finds, in the exercise of its discretion, that they are unsuitable for parole in light of the circumstances specified by statute and by regulation." (*Ibid.*)

Article V, section 8, subdivision (b), of the California Constitution authorizes the Governor to review the Board's parole decisions in murder cases with indeterminate terms "subject to procedures provided by statute." As further provided therein, the Governor's consideration is constrained by application of the same factors that the Board is required to consider when determining whether to grant parole.[9] The Governor is to

---

[8] Further references to the "Regulations" or "Regs." are to this title.

[9] Article V, section 8, subdivision (b), of the state Constitution provides: "No decision of the parole authority of this state with respect to the granting, denial, revocation, or suspension of parole of a person sentenced to an indeterminate term upon conviction of murder shall become effective for a period of 30 days, during which the Governor may review the decision subject to procedures provided by statute. The Governor may only affirm, modify, or reverse the decision of the parole authority on the basis of the same factors which the parole authority is required to consider. The

"undertake an independent, de novo review of the prisoner's suitability for parole" but this review "is limited to the same considerations that inform the Board's decision." (*Rosenkrantz, supra*, 29 Cal.4th at pp. 660-661.) While the Governor must consider the same factors as the Board, he or she may weigh them differently and draw contrary conclusions. (*Id.* at pp. 669-670.) And consistently with this constitutional authority, section 3041.2, subdivision (a), provides that "[d]uring the 30 days following the granting, denial, revocation, or suspension by a parole authority of the parole of a person sentenced to an indeterminate prison term based upon a conviction of murder, the Governor, when reviewing the authority's decision pursuant to subdivision (b) of Section 8 of Article V of the Constitution, shall review materials provided by the parole authority."[10]

The parole decision of the Board or of the Governor is subject to judicial review through habeas corpus proceedings. "[T]he judicial branch is authorized to review the factual basis of a decision of the Board [or Governor] denying parole in order to ensure that the decision comports with the requirements of due process of law." (*Rosenkrantz, supra*, 29 Cal.4th at p. 658.) But in conducting such decisional review on the merits, "the court may inquire only whether some evidence in the record before the Board supports the decision to deny parole, based on the factors specified by the statute and regulation. If the decision's consideration of the specified factors is not supported by some evidence in the record and thus is devoid of a factual basis, the court should grant the prisoner's petition for writ of habeas corpus and should order the Board [or the Governor] to vacate [the] decision denying parole and thereafter proceed in accordance with due process of

---

Governor shall report to the Legislature each parole decision affirmed, modified, or reversed, stating the pertinent facts and reasons for the action."

[10] Section 3041.2, subdivision (b), further provides that if the Governor elects to reverse or modify the Board's parole decision, "he or she shall send a written statement to the inmate specifying the reasons for his or her decision."

law." (*Id.* at p. 658; see also *In re Scott* (2004) 119 Cal.App.4th 871; *In re Scott* (2005) 133 Cal.App.4th 573.)[11]

"Court review of a Governor's decision ensures, among other due process rights, that the decision be supported by some evidence, the same standard for reviewing Board decisions. '[T]he voters in adopting the constitutional provision [(art. V, § 8)] placed substantive limitations upon the Governor's exercise of that judgment and discretion. The provision mandates that the Governor consider only the same factors that may be considered by the Board. Having chosen to review a parole decision, the Governor lacks discretion to disregard this requirement, which distinguishes the Governor's parole review authority from his authority to grant pardons and commutations. Because this requirement gives rise to a liberty interest protected by due process of law, and because due process of law requires that a decision considering such factors be supported by some evidence in the record, the Governor's decision is subject to judicial review to ensure

---

[11] The California Supreme Court currently has on review two cases that involve the proper scope of judicial review in parole cases. The first case is *In re Lawrence* [S154018, review granted September 19, 2007] in which the issue presented as reflected on the Court's website is "In making parole suitability determinations for life prisoners, to what extent should the Board of Parole Hearings, under Penal Code section 3041, and the Governor, under [a]rticle V, section 8(b) of the California Constitution and Penal Code section 3041.2, consider the prisoner's current dangerousness, and at what point, if ever, is the gravity of the commitment offense and prior criminality insufficient to deny parole when the prisoner otherwise appears rehabilitated?" The other case is *In re Shaputis* [S155872, review granted October 24, 2007] in which the issues presented include: "(1) In assessing whether 'some evidence' supports a decision by the Governor to deny parole, is the inquiry limited to whether the reasons stated have a factual basis or should a reviewing court also examine whether the evidence supports a finding that the inmate presents an unreasonable current risk of danger to the public? (2) When a reviewing court determines that a gubernatorial parole decision is not supported by sufficient evidence, should it remand the matter to the executive branch to proceed in accordance with due process, or should it order the inmate's immediate release?" (See http://appellatecases.courtinfo.ca.gov.)

9

compliance with this constitutional mandate.' (*Rosenkrantz, supra*, 29 Cal.4th at pp. 663-664.)" (*In re Elkins, supra*, 144 Cal.App.4th at pp. 488-489.)

All of that said, we reiterate that we are not here reviewing the merits of a gubernatorial reversal of a parole grant. We are instead concerned only with whether the Governor's 2006 reversal of the Board's 2005 grant of parole also operated to reverse the 2002 grant, which was before the Governor on remand at the time of his 2006 reversal.[12] This raises due process considerations and addresses whether the Governor's 2006 reversal complied with state constitutional and statutory mandates in connection with the 2002 grant of parole.

III.     *Our Opinion in Huynh II*

In order to resolve the question whether the Governor's 2006 action operated to reverse the 2002 grant of parole as reinstated on remand from this court, it is first necessary to address whether the Governor complied with the substance of our opinion in *Huynh II*. In order to answer that, it is necessary to understand just what our opinion decided and directed on remand.

As noted, Huynh first received a grant of parole in 2002, which was reversed by Governor Davis in 2003. Huynh challenged the Governor's reversal, and the trial court granted a writ of habeas corpus, which we reviewed on direct appeal by the Warden. We affirmed but modified the trial court's order, directing vacation of the reversal and remand to Governor Schwarzenegger to consider, in accordance with due process,

---

[12] When we say "before the Governor," we mean that the April 27, 2006 reversal was within the 30-day period after the April 14, 2006 reinstatement of the 2002 parole grant. And while there is no other constitutional or statutory provision addressing the time within which the Governor must act on remand after vacation of a prior reversal of the Board's grant of parole, the parties appear to agree that the 30-day period provided at article V, section 8, subdivision (b) of the California Constitution and section 3041.2, subdivision (a), for the Governor's review of a decision by the Board to grant, deny, revoke, or suspend parole is also operative here. Accordingly, for purposes of this appeal, we assume without deciding that this is the case.

whether the gravity of the commitment offense—the only factor of the six cited by
Governor Davis of which there could be said to be "some evidence" in the record,
coupled with factors favoring suitability that the Governor had failed to consider—alone
warranted reversal of the 2002 parole grant.

With respect to the gravity of the commitment offense, Governor Davis did not
reference particular factors from section 2402, subdivision (c) of the Regulations, which
relates to this element as favoring unsuitability for parole. But we concluded in *Huynh II*
that by his cited facts, the Governor had intended to invoke subdivision (c)(1) of this
section, which states, "[t]he prisoner committed the offense in an especially heinous,
atrocious or cruel manner." Circumstances tending to meet this description are that "[t]he
offense was carried out in a dispassionate and calculated manner, such as an execution
style murder" and that "[t]he offense was carried out in a manner which demonstrates an
exceptionally callous disregard for human suffering." (Regs., § 2402, subd. (c)(1)(B) &
(D).)

We concluded in *Huynh II* that some facts cited by the Governor regarding the
gravity of the commitment offense were not supported by the record or were taken out of
context. Specifically, we observed that the assertion that Huynh had lured his wife to a
more vulnerable location or that she herself was more vulnerable on a public street rather
than in her private home was unsupported. In fact, we found the record to support the
opposite conclusion—that his wife was less vulnerable where there were other people
around to witness the shooting and call for aid. We concluded similarly regarding the
Governor's statements that Huynh had first purchased a gun two months before the
shooting as if in preparation for it, finding that the record instead supported that he had
previously owned a gun but had exchanged it in the months before the shooting for the
smaller one he ended up using to kill his wife, a less intentioned scenario. We likewise
concluded that the Governor's statements to the effect that Huynh had surreptitiously
obtained his wife's address from the Department of Motor Vehicles in violation of a court

order were without factual support, as was his implication that Huynh's wife had not died instantly from her wounds and instead lay there, alive but bleeding profusely, while Huynh sat emotionless, failing to take action that might have saved her life.

But we also concluded in *Huynh II* that there could be said to be some evidence in the record that was indicative of the gravity of the life crime and that "some of these facts may have aggravated the crime beyond what was minimally necessary to sustain a conviction for second degree murder." (*Huynh II, supra*, H028888.) Specifically, we found that it was a "fair reading of the record to say that Huynh had had thoughts of shooting [his wife], and that he brought the loaded gun to their emotionally charged encounter, along with extra ammunition. There was a restraining order in effect as a result of previous domestic violence. When the discussion turned heated, Huynh blocked [his wife's] car from being able to leave and then he hit his gun against her window in an attempt to break it so that he could hit her. It is also true that after the first shot, he reloaded the gun and shot four more times, following her car across the street in order to do so." (*Ibid.*) Based on these facts, we concluded that "[r]easonable minds may differ regarding whether these facts, or any other relating to the commitment offense, aggravate the crime beyond second degree murder." (*Ibid.*)

We also observed with respect to the gravity of the commitment offense that the Governor had failed to consider "the undisputed evidence of Huynh's motivation for the crime—that he committed it as the result of significant stress in his life, which had built up over two years as a result of his wife's infidelities and emptying of their bank account of significant amount of money on two occasions, as well as the losses of his business, his marriage, and his home." (*Huynh II, supra*, H028888, fn. omitted.) This was a factor that the Governor was required to consider under section 2402, subdivision (d)(4) of the Regulations and, we concluded, his failure to have done so rendered his "decision on this point 'arbitrary and capricious in the sense that he failed to apply the controlling legal principles to the facts before him. [Citation.]' [Citation.]" (*Huynh II, supra*, H028888.)

35

We further found that the other five factors cited by Governor Davis in reversing the 2002 grant of parole were also lacking evidentiary support in the record. For example, we found that contrary to the Governor's statements, Huynh had accepted responsibility for the crime and that he had unquestionably shown remorse for it. We likewise found the assertion that Huynh had failed to participate in self-help or therapy programs, or that he needed such programming in order to make him suitable for parole, lacking in factual support. We specifically concluded that this gubernatorial finding was arbitrary and capricious, and thus violative of due process. We also concluded that there was no evidentiary support for the Governor's assertions that Huynh lacked the life skills to function in an unstructured environment upon release, that he lacked adequate parole plans, and that he had an unstable social history as evidenced by the single relationship he had with his wife.

Finally, in addition to our concluding with respect to the gravity of the commitment offense that Governor Davis had failed to consider that Huynh had committed the crime as a result of significant stress in his life, we also found that the Governor had failed to consider Huynh's advanced age (64 at the time of the 2002 grant of parole), which is a separate factor favoring suitability under section 2402, subdivision (d)(4) of the Regulations.

As a result of our analysis and conclusions in *Huynh II*, we affirmed but modified the trial court's grant of habeas relief, remanding the matter to Governor Schwarzenegger. On remand, he was to reconsider whether based on facts supporting the gravity of the commitment offense, excluding those for which we had found a lack of evidentiary support in *Huynh II*, and with due consideration of other facts favoring suitability that the Governor had previously failed to but was required to consider, the gravity of the commitment offense alone still warranted a reversal of the 2002 grant of parole. Consistently with our direction, on April 14, 2006, the trial court vacated the

13

36

2003 parole reversal and remanded the matter to the Governor for reconsideration in light of our opinion if he so chose, thus reinstating the 2002 grant of parole as of that date.

IV.    *The Governor's 2006 Reversal*

As noted, the Board held a hearing and granted Huynh parole for the second time in late-2005, the decision becoming final in April 2006. The details of that grant are not at issue here. But the Governor issued his "Indeterminate Sentence Parole Release Review" under section 3041.2 on April 27, 2006, the conclusion of which stated, "I REVERSE the Board's 2005 decision to grant parole to Mr. Huynh." In contrast, the heading of the document indicates the action "reverse" as opposed to the other choices of "affirm" or "modify," and it does not refer to a particular grant of parole.

Turning to the substance of the Governor's 2006 review, he detailed the factual events surrounding the crime, omitting Governor Davis's prior unsupported references to Huynh having lured his wife to a more vulnerable location, having first purchased a gun in the two months before the shooting, having surreptitiously obtained her address from the Department of Motor vehicles in violation of a restraining order, and having somehow allowed his wife to bleed to death by not taking action to prevent that outcome while she lay dying. Governor Schwarzenegger instead emphasized the facts of which we had previously found some evidence in the record in *Huynh II*—that Huynh had come armed to the encounter with his wife, that he had blocked her car from being able to leave, that he had struck his gun against her window and when that did not work to break it, he used his gun to shoot through the window. As her car drifted across the street after the first shot, Huynh followed, shooting his wife four more times, which involved reloading the gun once. The Governor also noted that Huynh had admitted having once hit his wife several times in the months preceding the murder, though he concluded that it was unclear whether that prior domestic incident had resulted in Huynh's wife obtaining a restraining order.

14

Further with regard to the commitment offense, the Governor's 2006 reversal concluded that its gravity outweighed the factors supporting parole suitability, which we will get to, in that Huynh's actions before the crime "demonstrated some level of premeditation," rendering this an "especially heinous second-degree murder." In support of this conclusion, the Governor cited Huynh's "plan on the day of the murder" to shoot his wife and then himself, as "stated" in "both the probation report and the 2002 Life Prisoner Evaluation." He further cited that after the first shot, Huynh's wife's car began coasting across the street, providing him a "clear opportunity to discontinue his conduct," but he instead shot four more times, reloading his gun in the process. The Governor also cited as support for the heinous nature of the crime that Huynh had committed the shooting in a public place, thus endangering other people. Our opinion in *Huynh II* put none of these underlying cited "facts" concerning the gravity of the commitment offense out of bounds for the Governor's consideration on remand. Nor did these "facts" constitute new information unavailable for consideration in 2002, relating as they do to events taking place in 1988.[13]

Further with respect to the gravity of the commitment offense, the Governor's 2006 reversal specifically considered, as we directed in *Huynh II*, that Huynh had committed the crime as a result of experiencing significant stress in his life. Indeed the Governor cited all the underlying facts contributing to that significant stress as we had outlined in our opinion—Huynh's loss of his marriage, his family, his finances, his home, and his business. Having considered this factor, which also relates to the gravity of the commitment offense and which favors suitability for parole, the Governor nevertheless

---

[13] We emphasize that the merits of the Governor's 2006 reversal are not before us on this appeal. We thus here only loosely describe these cited events as "facts," preferring to reach whether these "facts" are supported by some evidence in the record in the appropriate context.

38

concluded that the "gravity of the murder [Huynh] committed presently outweighs the positive factors tending to support his parole suitability."

In terms of other factors favoring suitability, Governor Schwarzenegger correctly noted consistently with our opinion in *Huynh II* that Huynh had "managed to maintain a discipline-free conduct record;" that he had made efforts to "enhance his ability to function within the law upon release;" that he had "availed himself of available self-help and therapy," including substance-abuse related programming even though he had no history of such problems; that he had accepted responsibility for the crime and felt remorse; that mental health professionals had assessed his risk of danger as low; that he had solid parole plans, whether he were to be deported to France where he is a citizen or to remain in California; and as we specifically directed in *Huynh II*, that his advanced age reduced the probability of his recidivism.

As noted, in spite of all these factors favoring suitability, the Governor still relied on the gravity of the commitment offense alone to support his 2006 reversal. And he did so by citing to "facts" that were either acknowledged to have some support in the record in *Huynh II*, or by citing to additional "facts" that dated back to the events of the crime, but were not specifically cited by Governor Davis and therefore were not addressed in *Huynh II*. And Governor Schwarzenegger did not rely on any of the other five factors cited by Governor Davis, evidentiary support for which we found wanting in the record in *Huynh II*. We can only conclude, therefore, that the substance of the Governor's 2006 parole reversal directly complied with our directive in *Huynh II* to reconsider reversal of the 2002 grant of parole on remand "in light of the views expressed" therein.

V.    *The Governor's 2006 Review Operated to Reverse Huynh's 2002 Parole Grant Then Before the Governor on Remand*

Having concluded that the Governor's 2006 reversal entirely complied in substance with our direction on remand, the question remains whether his failure to specifically and expressly say, at the conclusion of the review, that he was reversing both

16

39

the 2005 *and* 2002 grants of parole is fatal to his position that the reversal operated as to both.[14] We find no authority that compels such conclusion, and Huynh cites to none.

First of all, with respect to this question, article V, section 8, subdivision (b), of the California Constitution merely provides that in the 30 days following the grant, denial, revocation, or suspension of parole by the parole authority, the Governor may review the decision subject to procedures provided by statute, and may "only affirm, modify, or reverse the decision of the parole authority on the basis of the same factors which the parole authority is required to consider." The provision does not dictate the form of the Governor's review, other than that he must "report to the Legislature each parole decision affirmed, modified, or reversed, stating the pertinent facts and reasons for the action." (Cal. Const., art. V, § 8, subd. (b).) Section 3041.2 similarly does not dictate the form of the Governor's action when he exercises this constitutional authority, other than to specify that the Governor "shall review materials provided by the parole authority" and "shall send a written statement to the inmate specifying the reasons for his or her decision." (§ 3041.2, subds. (a) & (b).) Thus, contrary to Huynh's contention, the form of the Governor's 2006 reversal of the 2002 grant of parole did not violate the Constitution or a controlling statute.

Huynh's contention boils down to the claim that the Governor's failure to expressly reference the 2002 grant of parole along with the 2005 grant in the conclusion of the reversal means that there has never been a reversal of the earlier grant on remand.

---

[14] We emphasize that the question is not whether the Governor subjectively intended to reverse the 2002 grant of parole. It is instead whether the written review, coming as it did within the 30-day period following reinstatement of the 2002 grant, substantively effected its reversal in accordance with due process considerations. Of course, if the Governor had intended by his 2006 review to also reverse the 2002 grant of parole, it would have been preferable for him to expressly say so in his conclusion. And better yet, it would have been preferable for the sake of clarity for him to have issued a separate review for each grant, each limited to a discussion of information before the particular Board that granted parole in each instance.

40

But as our examination of *Huynh II* and the substance of the Governor's 2006 reversal demonstrate, that is not the case. As we have shown, the reversal, in substance, was directly responsive to and compliant with our direction in *Huynh II,* and it was timely issued within the 30-day period following the reinstatement of the 2002 grant of parole on remand.

And resting the reversal as he did on the gravity of the commitment offense alone, the Governor was not required to discuss every other factor and circumstance addressed by the 2002 parole authority, even though the reversal does actually discuss most of them as factors favoring suitability. (*In re Morrall* (2002) 102 Cal.App.4th 280, 299-300 [in performing parole review function, the Governor is not required to discuss every factor considered by the Board and the failure to do so signifies only that the Governor had no factual disagreement with the Board's assessment of those factors].) Further, as the Warden points out, that the Governor did not address the 2002 parole authority's selection of the mid-term as the appropriate sentence (as opposed to the aggravated term selected by the 2005 Board) is not relevant here because it only becomes so when an inmate is ultimately determined to be suitable for parole, which, due to the Governor's reversal, did not happen here. (*In re Dannenberg* (2005) 34 Cal.4th 1061, 1087-1088, 1097-1098; § 3041.)

Finally, the evidentiary presumption that an official duty has regularly been performed applies in parole cases, and in the absence of evidence rebutting that presumption here, we will presume that the Governor regularly performed his parole review of the 2002 grant of parole on remand. (Evid. Code, § 664; *In re McClendon* (2003) 113 Cal.App.4th 315, 323.) This presumption is especially applicable here because it is clear in light of the Governor's express reversal of the 2005 grant of parole that he wished to exercise his constitutional power of parole review in this particular case.

41

There is another argument against reversal in this case, not directly made by Huynh. It is that if the Governor's 2006 review operated to reverse the 2002 grant of parole, then the Governor erred by considering later information in the course of that review that was not available to the 2002 Board, such as "2004 mental-health evaluation notes," which demonstrated Huynh's remorse for the crime and his age of 68 at the time of the 2005 Board hearing. (*In re Gray* (2007) 151 Cal.App.4th 379, 401-402 [in reversing grant of parole, it was error for Governor to have considered information available to later Board that was not before particular Board whose decision was being reviewed]; *In re Arafiles* (1992) 6 Cal.App.4th 1467, 1478 [Governor must confine his review to record that was before hearing panel].)[15] But since these two factors favored suitability, it cannot be said that any error was prejudicial as the Governor chose to rest his reversal on the gravity of the commitment offense alone, in spite of having considered other factors, all of which were favorable to Huynh.

In sum, we are convinced that the Governor's 2006 parole review operated to reverse the 2002 grant of parole. The reversal substantively addressed and complied with our directive in *Huynh II* on remand, and it was issued within the 30-day period following reinstatement of the 2002 grant. And there has been no constitutional or statutory violation demonstrated, or a violation of Huynh's rights to due process. To hold otherwise would thwart the gubernatorial authority provided by article V, section 8, subdivision (b), of the California Constitution and section 3041.2, and would similarly thwart the Governor's decision, substantively and objectively expressed, to reverse the grant of parole in this particular case based on his conclusion that the gravity of the commitment offense outweighs other positive factors favoring suitability.

---

[15] This demonstrates that the better practice may be to separate and not combine gubernatorial reviews of discrete parole decisions made by different Boards or hearing panels.

42

DISPOSITION

The trial court's order granting habeas relief and directing Huynh's release on parole pursuant to the 2002 grant of parole is reversed.

_____
Duffy, J.

WE CONCUR:


_____
Bamattre-Manoukian, Acting P.J.




_____
McAdams, J.




<u>In re Huynh on habeas corpus</u>
No. H030670

A4

# EXHIBIT "E"

*HUYNH.E.30185*
*SA -146-L*

Court of Appeal, Sixth Appellate District - No. H030670
S160213

# IN THE SUPREME COURT OF CALIFORNIA

## En Banc

In re NAM VAN HUYNH on Habeas Corpus

The petitions for review are denied.

SUPREME COURT
FILED

MAR 1 9 2008

Frederick K. Ohlrich Clerk

_____ Deputy

_____
Chief Justice

NAM-VAN-HUYNH. E:30183.

C.T.F. NORTH (SA-146-L)

P.O. BOX 705

SOLEDAD , CA.93960-0705

   April 24, 2008.

E-filing



CLERK OF THE COURT

U.S. DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

450  GOLDEN  GATE  AVENUE

CV 08 ~ 2195

SAN FRANCISCO , CA.94102.

        DEAR SIR ,

       ENCLOSED ARE THREE COPIES OF MY PETITION OF HABEAS CORPUS ,

PLUS A SINGLE COPY OF THE FRONT PAGE OF THAT PETITION OF HABEAS CORPUS,

WITH MY SELF ADDRESSED STAMPED ENVELOPE, TO BE STAMPED AND RETURNED.

       ALSO, PLEASE BILL TO ME THE EXACT MONEY I NEED TO PAID FOR

THE COST OF FILING FEE.

       THANK YOU FOR YOUR ASSISTANCE IN THIS MATTER.

       RESPECFULLY YOUR,

       NAM-VAN-HUYNH. E:30183.

FROM : NAM-VAN-HUYNH. E:30183,
C.T.F. NORTH (SA-146-L )
P.O. BOX 705
SOLEDAD , CA.93960-0705

LEGAL MAIL

RECEIVED

TO:   CLERK   OF   THE   COURT
NORTHERN , U.S . DISTRICT COURT
DISTRICT OF CALIFORNIA.
450 GOLDEN GATE AVE.
SAN FRANCISCO, CA. 94102.

